# COURT OF OYER AND TERMINER.

STATE *vs.* DANIEL BROWN, JOHN J. SWAN and MICHAEL LYNCH.

New Castle County, February Term, 1896.

**Homicide. Manslaughter.**—Manslaughter is the killing of a human being without malice, but under such circumstances as cannot render it wholly innocent, or excusable or justifiable in law.

**Homicide. Murder of the Second Degree.**—Where one kills another without any, or without any considerable provocation, when the killing in done, or the mortal wound is inflicted with a deadly weapon, or arises from any unlawful act of violence, from which the law raises the presumption of malice, the crime is murder of the second degree.

**Homicide. Insanity.**—In the management of an asylum for the insane, so much force must be used in each particular case as may be necessary to enforce and maintain wholesome discipline and sanitary regulations.

**Same.**—The law will not measure with extreme nicety or exact calculation, just how much force the attendant in an asylum for the insane may use, provided he acts reasonably and without intentional cruelty or viciousness.

**Indictment. Grand Jury. Pleading. Arrest of Judgment.**—Where an indictment was found by a grand jury, sitting, as such, in and for the Court of Oyer and Terminer, and no order to summon a grand jury was contained in the precept for holding the Court, but a direction to summon a grand jury was written on the margin of the precept by the Clerk of the Court, upon the verbal order of the Chief Justice, and no plea of abatement was entered but the case proceeded to trial and verdict; *held,* by a divided Court, that the objection was waived by failure to plead in abatement and a motion in arrest of judgment would not be entertained.

Syllabus.

**Practice. Witness. Division of Opinion.**—In the Court of Oyer and Terminer where the Court is equally divided upon an objection to the competency of a witness, the objection fails and the witness may testify.    So where the Court is divided upon a motion for a new trial or in arrest of judgment the motion fails.

**Practice. Post Mortem Examination.**—An application before indictment, on behalf of persons held, upon a charge óf murder, to await the action of the Grand Jury, for leave to have an examination made of a portion of the body of the deceased, in the possession of the Coroner and subject to the control of the Attorney-General, will not be granted.

**Practice. Witness. Cross-examination.**—Where several defendants in a case in the Court of Oyer and Terminer have different counsel, one for each defendant separately represented will be premitted to cross-examine witnesses for the State.

**Practice. Jury. Challenge.**—Where the peremptory challenges allowed to the State are waived and the exercise of the right of challenge by the defendant causes vacancies in the jury as previously drawn, the right of challenge on behalf of the State may still be exercised with respéct to persons drawn to fill such vacancies.

**Witness. Stenographer. Privileged Communications. Public Policy.**—A stenographer employed by the Attorney-General to assist in preparing a case for trial will not be permitted to disclose facts coming to his knowledge in the course of said employment.    Such communications are privileged and the disclosure of them is against public policy.

**Practice. Judgment. Sentence.**—After a conviction of manslaughter and denial of a motion in arrest of judgment by a divided Court, judgment passes as a matter of course, and sentence will be pronounced without a motion for judgment on behalf of the State.

**Practice. Jury. Verdict. Sunday.**—Where the Court has taken a recess on Saturday without an adjournment and the jury comes into Court on Sunday, having reached an agreement, by consent the verdict may be taken by the Clerk on that day, and formally entered by order of the Court on the following day.

**Practice. Jury.**—On the trial of an indictment for murder in the second degree the jury will not be permitted to separate.

**Insanity. Witness.**—Where a witness had been, at the time of the commission of the act which was in question in the trial, an inmate of an insane asylum, duly committed thereto, under the statute, on a certificate of two physicians, *held*, by a divided Court, that that fact did not *per se* render him incompetent as a witness.

**Same. Burden of Proof.**—Where objection is made to the competency of a witness on the ground of insanity, the question of competency is to be determined exclusively by the Court, and the burden of proof is on the party, who makes the objection, to sustain it.

The defendants, Daniel Brown, John J. Swan and Michael Lynch were indicted for murder in the second degree, upon the charge of killing Leon Pisa, an inmate of the Delaware Hospital for the insane at Farnhurst. The first and second counts of the indictment charged that all three of the prisoners feloniously assaulted Leon Pisa, the deceased. In the first count it was charged that the mortal wound was inflicted by Daniel Brown; in the second count, by John J. Swan, while the other two prisoners were aiding and abetting in the murder as accomplices. It appeared at the trial that on the fifth day of October, 1895, between eight and nine o'clock in the morning, at the Delaware State Hospital for the Insane, at Farnhurst, in New Castle County, Leon Pisa, an inmate of the asylum, died from injuries received at that time. The State produced evidence to prove that the prisoner Brown, aided by one Thomas Oakes, took the deceased from the west end of the corridor, to the bath-room door in the east end of corridor C to bath him; that he was there stripped by Brown, thrown down with violence upon the floor; jumped on and punched by the knees of Brown, and kicked in the side by Swan. That his skull over the temporal bone on the right side of the head was fractured and crushed, the ninth and tenth ribs on the right side were broken in two. That Brown and Swan then

Questions of Practice.

roughly picked him up from the floor, Brown pushing him through the door into the bath-room and down upon the floor; that they were then joined by Lynch, who stripped off the clothing of the deceased, and, aided by Swan, threw him roughly into the bath tub. That death resulted from the injuries thus received.

The defendants, on the other hand, offered evidence to prove that Pisa was not maltreated. That under the rules of the institution it was necessary to bathe him, and to use so much force as was reasonably necessary to effect that purpose; this being essential to the maintenance of discipline and the sanitary regulations of the asylum. That Pisa violently resisted the attempt to bathe him. That at the bath-room door he seized Brown by the throat and a violent struggle there ensued. When Pisa's grip was broken, he was much exhausted; was lifted up and pushed inside the bath-room door, walked to the end of the bath-tub, there reeled, fell and received the injuries which caused his death. That he was stripped of his clothing by Lynch, aided by Swan; placed in the bath tub, but did not revive; that his body was then taken out, dried and carried across the corridor practically dead. That in the transaction no more force was used than was absolutely necessary.

At the trial the following questions were passed upon.

*H. H. Ward* and *Andrew C. Gray*, for Daniel Brown and John J. Swan, two of the defendants who were held upon the charge of murder, to await the action of the Grand Jury, made an application to the Court, before indictment found, stating that the heart of the deceased was in the possession of the Coroner of New Castle County, and under the control of the Attorney General, and that an expert analysis and examination of it was material to the defence, and asked for an order on the Coroner and the Attorney General to produce said heart (it not to be taken from the custody of the Coroner or any person designated by the Attorney General), to be examined in order that their expert might testify in the case intelligently.

LORE, C. J.   We refuse to make the order at this time.   The parties have not yet been indicted, and there is no case before this Court.

Subsequently, *Walter H. Hayes,* for Michael Lynch, one of the defendants, stated to the Court that there was no rule in the Court of Oyer and Terminer, as there was in the Superior Court, as to the examination and cross-examination of witnesses ; that in this case he and *Mr. John K. Bradford* represented Michael Lynch, while *Messrs. Gray* and *Ward* represented the other two defendants, Brown and Swan.   He asked that one of the counsel for Lynch, and also one of the counsel for Brown and Swan be allowed by the Court to cross-examine the State's witnesses.

It was so ordered by the Court.

Under the statute law the State is entitled to three challenges and the prisoners to six.   While empanelling the jury, *White,* Attorney General, waived his right to challenge three times, but exercised it upon the jurors called to fill the vacancy made by the fourth challenge of the defendant, claiming the right to challenge any objectionable man that might be placed in the box by reason of the exercise of any or all of the last three challenges to which the defense were entitled.

This was objected to by *Hayes* and *Ward,* for the prisoners, who contended that the State could not reserve its challenges, that having passed them three times, it had thereby exhausted the number of challenges to which it was entitled, just the same as if the right of challenge had been exercised in each case.   They cited the unreported case of *State vs. Farra,* as to which there was difference of recollection among the members of the Bar.

LORE, C. J.   There is doubt about the ruling in the Farra case, and we think we should rule upon this matter.   The rule applying in civil cases is that each counsel has an opportunity to pass upon the whole jury, except the last challenge, and if he passes his

right to challenge, there is reason why he should forfeit that right. But here we are confronted with the peculiar case of one party challenging six, and the other only three. The reason which would sustain the rule in a civil case does not hold here, because as we explained, there, (excepting the last man) each side passes upon the entire jury; but here, under the contention, the State could pass only upon nine jurors and the other three men are put in the box irrespective of the right of the State to say whether they are proper men or not. The reason ceases; and I should be very unwilling to be bound by such a precedent as that cited, unless it was perfectly clear. We therefore rule that the State may exercise its right to challenge after it has waived its right three times, but not upon any juror who is in the box at the time of the waiver. The Attorney General may now exercise his right to challenge the juror called since he passed his challenge.

*White*, Attorney General, here stated to the Court that it had been the practice in Sussex County, in a case of murder in the second degree not to allow the jury to separate, but to keep them together under the charge of a balliff, until the verdict was rendered, and asked that such an order might be made in the present case. Counsel for defendants neither opposed nor assented, but stated that it was a matter for the discretion of the Court.

LORE, C. J. A majority of the Court think that in felonies of as high a grade as murder in the second degree, the jury ought not to separate.

David M. Waples, being produced by the State as a witness, was objected to by the counsel for the defense on the ground of incompetency to testify by reason of insanity.

Dr. Hiram R. Burton, a witness produced by the defense, testified that he had been a practising physician for about twenty-eight years, but that he was not an expert or specialist in insanity. He proved the execution of a certificate, dated June 5, 1895, signed

by himself and Dr. J. W. Marsh, whose signature was admitted, upon which the witness, David M. Waples, was admitted to the Hospital for the Insane at Farnhurst.

The certificate was offered in evidence and was admitted as such for the Court, upon the question of competency, but not for the jury.

Dr. Burton then testified further that the certificate was in his judgment a true statement of the mental condition of David M. Waples at the time of its date. On cross-examination, by the Attorney-General, he gave a detailed statement of the physical and mental condition of the proposed witness prior to the making of the certificate. The history of the case satisfied him that the mental condition of Waples " had not been right for a good while." The witness testified that the information from his family was that he had been acting strangely, and that he was very violent, and even vicious at times. The effect upon him at stated periods or irregular periods, was that he neglected his business without apparent reason, and having first complained of severe pains in his head became violent so that his family, including his wife, were afraid to stay in the house with him. On the first visit, the witness, being unable to go immediately, saw Waples and talked with him but did not " think that he was a proper subject to be sent to Farnhurst." The witness was told that the paroxysm had passed, but it was much desired by the family that he should see the patient in one of them. Accordingly, in four or five days he went again, and found Waples not quite so well and his mind was a little out of balance ; but still the witness did not form an opinion at that visit. He made as much inquiry as possible, and told them that he would prefer to wait. In three or four days more he made a third visit and found him " unmistakably deranged." He thought that the disorder was caused by nocturnal epilepsy ; that Waples " would have convulsions in the night and no one know anything about it, as he was in the habit of sleeping by himself, and that was the cause of the mental disturbance ; and I was very firmly convinced that he was a proper

subject for treatment in a hospital, or at Farnhurst, and so gave that certificate."

The witness testified further as to symptoms and mental delusions from which the patient suffered, and said that the commitment to Farnhurst was for insanity not for physical treatment; that in his judgment the mental disease grew out of epilepsy. Neither at the time the witness gave the certificate, nor the last time he saw him would he say that Waples was capable of giving an account of what might happen before him in his presence; at other times witness saw him there was nothing conclusive; he had pain but no fever and did not talk intelligently in answer to questions. At these visits he could understand what was going on in his presence and give an account of it, and, added the witness, " had I not known the man and his history, I should have taken as correct anything that he told me." " I don't say that I thought he was perfectly sane at all of those other times; I was in doubt about it." In reply to a question from the Court the witness said that at the time of the certificate, the insanity did not manifest itself in any special manner, it was a general mental disturbance.

Dr. John H. Hammond, a witness called on behalf of the defendant, testified that he was assistant physician at the Delaware State Insane Asylum at Farnhurst; that David M. Waples was a patient there on October 5, 1895, and had not been discharged but allowed to go home on parole about the night before Thanksgiving. It was the custom very often where cases were not considered dangerous to let their people take them away. In the opinion of the witness while Waples was in the institution and when he left it, reliance could not be placed upon his memory and judgment. Not having seen him to talk to him since he left the asylum, he declined to express an opinion as to his condition at the time of the trial. On cross-examination the witness characterized the form of insanity, when Waples came to the asylum, as primary dementia, and expressed the opinion that while there he was not capable of giving an intelligent or correct account of anything which occurred in his presence,as to his mental condition at the present time the witness de-

clined to express an opinion.   On the redirect examination the witness said that from his knowledge of the case and of the condition of Waples while he was in the asylum, the witness would not think that he was in a condition to give a correct account at the trial of what happened while he was in the asylum.

David M. Waples being called for the purpose of being interrogated with a view of determining his sanity, *Hayes*, for the prisoners, objected to his being sworn.

LORE, C. J.  In examining a witness as to his competency, it is not proper to swear him.   The objection is sustained.

The witness was then examined and cross-examined at length. He testified that he was fifty-four years of age, that he understood the obligation of an oath and believed in God, he was a member of church and attended service when practicable; he went to Farnhurst June 6th, and left November 20th, going home with his son who came after him; he never had any trouble at the asylum; he remembered when Dr. Burton called to see him; his trouble at that time was pain in the head, he had been working in truck during some very hot days and the sun overcame him and caused neuralgia in the head; he had been sunstruck when he was twenty-one years of age.   He went to Farnhurst by train with Dr. Orr, and also returned by an express train which was stopped at the request of the doctor at the asylum.   He narrated intelligently and in detail the circumstances of his arrival at Farnhurst, and also other circumstances affecting himself referred to by date.

LORE, C. J.   We are equally divided upon this question. Judge Cullen and I are clearly of the opinion that this witness ought not to testify.   According to the statute law of this State, he has been proven to be insane, and as such has been committed to the Insane Asylum of the State of Delaware, at Farnhurst, where he was received as such and for a time confined.   Finding that he was not violent and therefore could be safely left to the care of his

family, he was permitted to go home upon parole and has been there for some time.

Insanity once proved, is presumed to continue until it is removed beyond a donbt. This was decided some years ago in the well contested case of *State vs. Thomas*, where Thomas was charged with killing his little daughter. He was proved by several physicians, in their judgment, to be insane a short time—one or two days—before. Chief Justice Comegys maintained that not withstanding he may have been insane at that time, unless he was insane at the time of the commission of the act, and so proved, the criminal incapacity would be removed.

On behalf of the prisoner it was contended with great force that insanity once proved, the cloud remains and must be rebutted with positive testimony, and after a most elaborate argument and against the personal conviction of Chief Justice Comegys, the Court so ruled.

Such in this case is the *status* upon the facts, of these men before us and such is the law governing it. Two witnesses, competent, skillful physicians of this State, under the law, committed the witness as insane. One of the physicians in charge of the institution says he was not discharged as a sane man, and his opinion is that the insane condition remains to this day, so as to unfit him to give a correct statement of what occurred. These men are being tried not for their lives, but upon a charge in which the penalty is imprisonment for life, if found guilty.

I am not willing, where that cloud once exists, unless it is clearly removed, that any man's life or any man's liberty should depend upon such testimony.

CULLEN, J. I fully concur with the views expressed by the Chief Justice, but there are other grounds upon which I rest this case. Unquestionably it is law, recognized by several decisions in our State that where a man is proved to be insane, it remains and shifts the burden of proof upon the other side to show the contrary. Notwithstanding that fact, if a person be confined in a lunatic asylum

and is afterwards brought forward as a witness, then it is a matter in the discretion of the Court to determine as to his capacity. That capacity is to be determined from the facts adduced before the Court. Because the parties cannot produce that evidence not is a matter with the Court. The testimony here on the part of two physicians is that this man could not give a correct statement; that this man was not a man to be relied upon, so far as his statements are concerned. That is Dr. Burton's testimony. Dr. Hammond says that during the time he was there, reliance could not be placed upon any statement he might make. So far as his testimony is concerned, he says that excepting upon this occasion, he has not seen him since he left the asylum. If the state had produced witnesses here and had shown that though he was utterly unfit at the time to testify, but that reason had been restored, notwithstanding the fact that he remained in the asylum, that would have brought it within the reasoning of Mr. Justice Field, unquestionably, but what have they here to show us that? Nothing in the world but the testimony of the party himself. Is there anything that goes to contradict or in any way impair the impression made upon our minds by the two witnesses who have testified here of this man's inability?

For these reasons, I concur with the Chief Justice.

GRUBB, J. The defence have objected to the admissibility of David M. Waples, as a witness for the State, on the ground that he is now incompetent to testify by reason of his alleged insanity. On this question we are equally divided. As Judge Marvel and I are on the prevailing side, in favor of his admissibility, we deem it proper to present the reasons for our decision, especially as our dissenting associates have expressed their views.

It is the duty of the Court to hold impartially the scales of justice between the prisoner and the State and to guard carefully the rights of both. This objection is now made to a witness for the State. Hereafter it may be urged against a witness for the· accused. Hence the importance of its careful decision.

It is not the credibility but the competency of the proposed

witness which is now to be decided. The question is not whether what he may say under oath shall be believed by the jury—that is for a future stage of this case—but whether or not he is now mentally competent so far as to be allowed to testify, as a witness for the State, subject to the right of the accused to show to the jury by his cross-examination, or by the inconsistency of his testimony with the satisfactory evidence in the case, that he is unreliable and ununworty of credit, in whole or in part. His credibility is for the jury to determine, while his competency is a preliminary question for the exclusive decision of the Court.

The only evidence before us touching his competency is that furnished by the certificate of his admission to the State Hospital; by the sworn testimony of Dr. Burton who signed it, and of Dr. Hammond, a hospital medical attendant, and by our own personal examination of the unsworn witness, Waples, himself.

It appears from the testimony that Waples was admitted under the statute, to the State Hospital, June 5, 1895, upon the certificate of Doctors Burton and Marsh, of his then being, in their judgment, a proper subject for hospital care and treatment; that he was an inmate therein at the time of the alleged slaying of Pisa, on October 5, 1895, and that he was dismissed therefrom—though not formally discharged—on November 28, about three weeks thereafter.

It is now well settled that every person, tendered as a witness is, as a general rule, presumed to be sane and competent to testify before the jury, until the contrary is shown to the satisfaction of the Court. Therefore, in this instance, the *onus* is upon the accused to show not only that Waples is insane, but that his insanity is of such a nature and extent as to render him mentally incompetent in respect to relating to this jury the facts of said homicide which he witnessed at the time of their occurrence, and also in respect to now comprehending the nature and obligation of an oath.

Formerly insanity was very imperfectly understood, and, consequently, according to the earlier common law doctrine, every insane person was deemed to be wholly and absolutely *non compos*

*mentis* and incompetent to testify as a witness.  But, in more recent times, the Courts, keeping pace with the progress of science and philanthropy, have greatly relaxed the ancient rigor of the common law in respect to the insane, and have materially modified the former strictness of the rule regarding their incompetency as witnesses.

The modern doctrine was formally adopted and announced, in England, in 1851, in *Regina vs. Hill,* 2 Den. Cr. Cas. 254, 6 Br. C.C. 255.  In 1882 this doctrine was approved and declared by the Supreme Court of the United States in *Dist. of Columbia vs. Armes,* 107 U. S. 519, 526, as follows :  " It is undoubtedly true that a lunatic or insane person may, from the condition of his mind, not be a competent witness.  His incompetency on that ground, like incompetency for any other cause, must be passed upon by the Court. and to aid its judgment, evidence of his condition is admissible.

But lunacy or insanity assumes so many forms, and is so often partial in its extent, being frequently confined to particular subjects, whilst there is full intelligence on others, that the power of the Court is to be exercised with the greatest caution.  The books are full of cases where persons showing mental derangement on some subjects evince a high degree of intelligence and wisdom on others The existence of partial insanity does not affect individuals, so affected, in the transaction of business on all subjects, nor from giving a perfectly accurate and lucid statement of what they have seen or heard."   *       *       *   " The general rule, therefore, is that a lunatic or person affected with insanity is admissible as a witness if he have sufficient understanding to apprehend the obligation of an oath, and to be capable of giving a correct account of the matters which he has seen or heard in reference to the questions at issue ; and whether he have that understanding is a question to be determined by the Court upon examination of the party himself and any competent witnesses who can speak to the nature and extent of his insanity."

This view has also been adopted by various State Courts of last resort and by text writers of the highest authority, and may now

be regarded as firmly established in both this country and in England. *Coleman vs. Commonwealth*, 25 Gratt. 865; *Holcomb vs. Holcomb*, 28 Conn. 177; 2 Taylor, Ev. § 1875; Wharton, Cr. Ev. §§ 370–373.

In view of the law as thus established we, on our side of the Court, do not consider that it can justly be held that the defence, by the evidence of said certificate of admission, and the testimony of Dr. Burton and Dr. Hammond, especially when taken in connection with Waples' satisfactory personal examination by the Court, have satisfactorily proven that, either at the time of said homicide, or at this hearing before us, Waples' insanity was or is of such a nature and extent that he is now mentally incapable of apprehending the nature and obligation of an oath and of giving a correct or reasonable account of the facts of that fatal occurrence.

The claim that the certificate itself affords a *prima facie* presumption of insanity to that extent is not warranted by either the purpose of the statute or the tenor of the certificate. The design of both is merely to provide for the admission of proper cases for care and treatment in this public hospital and to exclude all others. In purpose or effect it never was the Legislative design to pass upon either the competency of a witness or the responsibility of one charged with crime. The statute uses the word "insane" not in the ancient restricted sense but in the modern general and broad sense of insanity—embracing various forms and degrees of mental disease and derangement from total to partial insanity, and from whatsoever cause. If this interpretation be not sound then the beneficent and reasonable purpose of the statute will be defeated, and many really proper and deserving patients who are not totally demented, or absolutely incompetent or irresponsible mentally, must either be now put out, or hereafter kept out of the State Hospital. Hence, since insanity, as used in the certificate, may mean any form or degree of mental derangement—greater or less—which may, in the statutory contemplation, be proper for care and treatment in the hospital, it follows that said certificate does not neces-

sarily warrant the presumption that the patient named therein is mentally incompetent to testify in any case.

Therefore additional evidence is necessary to establish such incompetency. The only additional evidence offered by the defence for this purpose is the testimony of Dr. Burton and Dr. Hammond.

Dr. Burton has testified, in substance, that he does not think Waples was competent to testify to what occurred in his presence on June 5 last; as also has Dr. Hammond that he does not think that reliance could be placed on Waples' memory and judgment during the time he was an inmate of the hospital.

From these opinions we are asked to infer that Waples is not competent to testify respecting the facts surrounding the alleged slaying of Pisa on October 5 last. But as we, on our side of the Court, do not consider that these opinions are warranted by the facts before us, we cannot so conclude.

Both Dr. Burton and Dr. Hammond have been examined as medical experts. The value of expert testimony depends on the impartiality, learning, experience and judgment of the expert in respect to the subject of investigation. The Court should carefully consider the expert's means of knowledge and the reasons he assigns for the opinion he has given, and give or withhold credence to his testimony as they may find his qualifications sufficient, and his reasons satisfactory, or otherwise. The testimony of experts is to be considered like any other testimony, and is to be tried by the same tests and receive just so much credit and weight as the Court may deem it entitled to, viewed in connection with all the evidence before it.

In the present instance Dr. Burton has testified that he is not now an expert in mental diseases, and also that he has never examined Waples since he signed the certificate for his admission to the State Hospital. The fact is that he never examined him with respect to his competency as a witness, but solely for the purpose of determining whether or not he was a proper subject for care and treatment in that institution. Nor did Dr. Hammond ever examine Waples

with any particular reference to his mental competency as a witness. In his testimony he has expressly admitted that he has known nothing of him since he left the hospital, and has no personal knowledge of his present mental condition.

Dr. Burton's testimony clearly discloses that his opinion of Waples' mental condition was largely based upon information derived from his family and others who are not brought here to testify under oath and subject to the test of cross-examination. His examination of Waples was confined to three visits all made within ten days. Upon his first and second visits he was unable to certify that he was a proper subject for admission to the hospital. Upon his third visit he found him distracted by paroxysms of pain in the head, considered him deranged, possibly, as he supposed, by nocturnal epileptic fits—of which he had no proof or information however—and thereupon determined that he was a proper patient for the hospital, and signed the required certificate.

The only manifestations of Waples' insanity, mentioned by Dr. Burton as grounds for his opinion of his incompetency as a witness, were violence and neglect of business after the paroxysms of pain in his head, complaints of a conspiracy by others to injure him, and Dr. Burton's own mere conjecture of nocturnal fits of epilepsy. But the violence and neglect of business might be the natural result of his paroxysms of pain. The conspiracy was explained in the course of Waples' examination before us, during which it appeared that he had, a few days before Dr. Burton's first visit to him, been temporarily in custody on a criminal charge. Lastly, Dr. Burton's theory of nocturnal epilepsy seems to have been absolutely unfounded, as there is no proof from Dr. Hammond, or any one in or out of the hospital, that Waples ever suffered therefrom either there or elsewhere. On the contrary, Waples has stated, in his examination here, that, when a young man, he suffered from a sunstroke; that occasionally since, he has suffered extremely with neuralgia of the head when exposed to the sun, and that the day before Dr. Burton's third visit, whilst working in the hot sun, he

was seriously affected and was suffering acutely therefrom when the Doctor examined him and concluded to give the certificate.

The true theory, therefore, probably is that Waples' mind was at such times, temporarily disordered by these occasional recurrences of pain, resulting originally from sunstroke. But this description of insanity, or "mental disturbance" as Dr. Burton termed it, cannot be presumed to be permanent and to continue until the contrary be shown. *Hix vs. Whittemore*, 4 Metc. 545-47.

The only manifestations of Waples' "primary dementia," or of his mental incompetency to testify, detailed by Dr. Hammond in support of his opinions, were that when Waples first entered the hospital he "seemed to be depressed," would "sit around and not talk to anybody scarcely," and "did not want or care to see his brother," who was then sick in the hospital.

These are certainly slight grounds for the support of such opinions. Dr. Hammond failed to show any instances, during Waples' stay at the hospital, of the violence, nocturnal fits of epilepsy, or conspiracy vagaries upon which Dr. Burton had mainly based his opinion of his insanity and incompetency as a witness.

The fact that Dr. Hammond virtually discharged Waples from the hospital so soon after the homicide, clearly imports that he was practically restored, and reasonably warrants the inference that he was then, at the time of that occurrence, mentally competent to observe and relate the facts attending it. For it is highly improbable that he would have been guilty of the grossly culpable, and possibly criminal, negligence of releasing an inmate so insane as not to know, when at large, what he and those about him were doing.

Opposed to this insufficient evidence of his incompetency as a witness, is the very satisfactory result of the preliminary examination before us of Waples himself. Subjected as he was not only to examination by ourselves but by the counsel on both sides, pursuant to the established practice in both this country and England, he betrayed no indication of any form or degree of insanity—much less of incompetency to testify in this cause.

Questions of Evidence.

He not only showed that he comprehended the nature and obligation of an oath but, in appearance, manner, clearness, coherence and precision of expression, he proved to be a very superior witness. He promptly apprehended and answered every question and gave minute details with calmness and accuracy. He stated the day and hour, and with whom, he first went to the State Hospital; when and where he met Dr. Hammond and Dr. Hancker there, and the day and hour, and with whom, he left there and returned to his family. And although both doctors were then present before us, they have not undertaken to contradict these statements which show that when he both entered and left the hospital he was perfectly competent to testify.

In view of these and the other facts I have detailed, and of the law applicable to this question, it seems indubitable that Waples is a competent witness and should be admitted to testify for the State in this case.

MARVEL J., concurred in this opinion.

LORE, C. J. The Court being equally divided, the witness is admitted to testify.

E. C. Hardesty, the Court stenographer, was called as a witness, was asked by the counsel for the prisoner whether Oakes (another witness) did not make certain statements to the Attorney General, in his presence, when the Attorney General was engaged with Oakes in preparing the case for prosecution.

*White,* Attorney General, objected, upon the ground that Mr. Hardesty was acting as his private stenographer at the time, assisting in the preparation of the case for trial.

GRUBB, J. The defense proposed to show by Mr. Hardesty, (who was then acting as the private stenographer of the Attorney General) for the purpose of contradicting the witness Thomas Oakes, what that witnesss stated to the Attorney General when the

latter was engaged with said witness in preparing this case for prosecution. The law will not permit this. The Attorney General could not be required to disclose facts coming to his knowledge for the use of the State in its prosecution of the accused; nor can his private amanuensis or clerk, as Mr. Hardesty then was. To do so would be prejudicial to the public interest and would in many cases defeat the ends of public justice.

When the witness, Thomas Oakes, against objection by the State, was permitted, for the purpose of laying a ground for contradicting him, to state what he had said on this occasion to the Attorney General, in order to aid him in preparing for the prosecution of this case, I considered that the ruling of the Court was erroneous. 'In public prosecutions, witnesses for the State and those who give information to the prosecuting officer will not be permitted to disclose whether or not they have given information to such officer. Such communications are regarded as secrets of State, or matters, the disclosure of which would be prejudicial to the public interests. They are therefore protected and all evidence thereof excluded from motives of public policy.

To allow the said witness to state that he had made a communication to the Attorney General respecting this prosecution, for the purpose of laying a ground for his subsequent contradiction by now calling Mr. Hardesty to the stand, was then as improper as it is now futile.

LORE, C. J. The objection is sustained.

LORE, C. J., (charging the Jury.)

It is your duty to determine under the proof in this case, whether the prisoners are guilty of murder in the second degree as charged in the indictment; or of manslaughter, of which they may be convicted under the statute if the evidence shall warrant; or not guilty.

The grades of homicide applicable to this case are three:

Murder in the second degree, manslaughter and excusable homicide.

Murder of the second degree is where a man kills another, without any, or without any considerable provocation, when the killing is done, or the mortal wound is inflicted with a deadly weapon, or arises from any unlawful act of violence, from which the law raises the presumption of malice. Malice is the necessary ingredient, indeed the test of murder. Unless from the facts in this case malice is proved beyond a reasonable doubt, you may not convict of murder in the second degree.

Manslaughter is the killing of a human being without malice, but under such circumstances as cannot render it wholly innocent, or excusable or justifiable in law. When the killing is done in the sudden transport of passion in the heat of blood, the law concedes that the act may be incident to the weakness and infirmity of our natures, and thus negatives implied malice, which is essential to the crime of murder in the second degree.

Excusable homicide may arise either from misadventure or in self defence, and when proved entitles the accused to a verdict of not guilty. Excusable homicide by misadventure, is the accidental killing of another when the slayer is doing a lawful act, unaccompanied by any criminally, careless or reckless conduct.

Under the statutes of this State " Every person who shall abet, procure, command or counsel any other person, or persons, to commit any crime, or misdemeanor, shall be deemed an accomplice and equally criminal as the principal offender." Where one is charged as an accomplice, in order to convict, it must be shown beyond a reasonable doubt that he was present feloniously and maliciously aiding and abetting, or counselling the killing of the deceased. If so present aiding and abetting, the act of one is the act of all, whichever may give the mortal wound, and all are alike guilty.

Let us now apply these rules of law to the case in hand.

It must be borne in mind that the deceased was one of that class of poor unfortunates, who in the providence of God are deprived of reason ; some temporarily, some permanently. Unable

Charge.

to control themselves and manage their property, they are thrown entirely upon the mercy of their friends or the public. In this case the deceased was one of the wards of the State. Their pitiful helplessness inspires every manly heart with commiseration and sympathy. The State having undertaken their charge, should see to it that their treatment is controlled by enlightened and humane regulations; their comfort cared for, and that skilful and merciful attendants shall be placed in charge of them. It should be remembered, however, that while insanity is sometimes quiet and harmless in its developments, that at other times it is active and violent; that in the management of such an asylum, so much force must be used in each particular case as may be necessary to enforce and maintain wholesome discipline and sanitary regulations. The law will not measure with extreme nicety or exact calculation, just how much force the attendants may use, provided he acts reasonably and without intentional cruelty or viciousness. If you were to bind the hands of the attendant by any such rule, his life might be in the unreasoning caprice of a violent maniac, and the insane practically govern the institution.

The care of the insane is at best no pleasant employment. It is our duty to protect these demented patients, by the closest scrutiny, and to punish wilful or careless cruelty; but it is equally our duty to protect the attendants in the discharge of their duty from unwarrented interference and reflections and uphold them in the maintenance of reasonable rules. This is absolutely necessary for the proper management of such institutions.

On the fifth of October, Brown, Swan and Lynch were lawfully engaged in bathing Pisa. They had a right to take him to the bath tub and to give him a bath. They had a right to use all such force as was reasonably necessary to effect that purpose. If you believe from the evidence in this case, they used no more force than was necessary, considering Pisa's strength, resistance and known disposition; then they were within the line of their duty and you should acquit them. Where death results under such circumstances, it is misadventure and no guilt may attach to the pris-

oners. In like manner you should acquit, if Pisa's death resulted from his own violence or fault.

If, however, they with criminal carelessness or recklessness used more force than was necessary, but without malice, it would be manslaughter. If the force used was so grossly reckless as necessarily to raise the presumption of malice, it would be murder in the second degree.

The prisoners are clothed by the law with the presumption of innocence. It is therefore the duty of the State to prove every material element of the crime charged beyond a reasonable doubt. If you entertain a reasonable doubt on any material point, you must acquit.

To convict of murder of the second degree you must be satisfied that death resulted from the violence of the prisoners, and that it was maliciously inflicted.

To convict of manslaughter you must be satisfied that death resulted from such violence, and that it was unlawfully inflicted without malice.

It is now for you to say of what crime these men are guilty, if guilty at all.

In determining this, you are to depend entirely upon the testimony given in this Court House from that witness stand, and must not consider any other sources of information whatever. You must divorce your minds absolutely from all sympathy, from all sensational reports, if they have come to you, from any source or at any time. Under the solemn sanction of your oaths, you stand between the State and these prisoners, sworn to consider only the evidence that has come to you under the statements of witnesses here produced and sworn, whom you have seen and heard, and whose reliability you must determine in reaching your verdict. By that, and by that alone, you must be governed.

Wherever there is doubt, where evidence is nicely balanced or conflicting, good character, so far as proved, must enure to acquittal.

You may acquit all or any one of the prisoners; in like man-

ner you may convict all or any one of them, as in your best judgment, under the law and evidence, you may determine. Your duty is to acquit the innocent, and to convict the guilty.

The jury having retired to their room on Saturday afternoon, remained out until Sunday morning (the Court having taken a recess without adjournment), when they appeared in Court and desired to render a verdict.

After due consideration by the Court, it was unanimously held that the verdict merely might be taken by the clerk and the jury discharged, which was accordingly done, without further proceedings in the case on that day, (Feb. 16.)

Verdict,—Not guilty as to Michael Lynch, guilty of manslaughter as to Daniel Brown and John T. Swan.

At the assembling of the Court on Monday, February 17, the following order was made.

·· LORE, C. J. The verdict of the jury was taken by the clerk yesterday, by consent, and now it is ordered by the Court that the verdict be formally entered.

Daniel Brown and John J. Swan, the defendants, by *Andrew C. Gray aud Herbert H. Ward*, their counsel, moved for a new trial, which motion failed, the Court being equally divided. They then moved for arrest of judgment.

The reasons assigned are stated *verbatim* in the opinion of GRUBB, J., *infra*.

*Ward* and *A. C. Gray*, in support of the motion.

The statutes, of this State, relating to the basis for this motion, are as follows:

" Whenever the Judges of said Court shall issue a precept for holding a Court of Oyer and Terminer, they may omit any direction to the Sheriff to summon a Grand Jury, if indictment have been found in the Court of General Sessions of the Peace and Jail De-

livery, in the cases which shall occasion the issuing such precepts, and if there shall be no person in jail, or on bail, charged with a capital offense and not indicted, or when from other cause, the said Judges shall deem the summoning of such Grand Jury unnecessary." Rev. Code (1893) ch. 83 § 3.

The Grand Jurors for the year, drawn as aforesaid, shall be summoned and returned to attend, as Grand Jurors, at any Court of Oyer and Terminer, when the precept for holding such Court directs a Grand Jury to be summond." Rev. Code (1893) ch. 109 §§ 10, 11.

" The Court of General Sessions of the Peace and Jail Delivery, within the several counties, shall have jurisdiction of all crimes and offenses not within the jurisdiction of the Court of Oyer and Terminer, except offenses committed by slaves and coguizable before a Justice or Justices of the Peace; and shall have cognizance of all crimes and offenses within the jurisdiction of the Court of Oyer and Terminer, so far that indictments therefor may be found in said Court; and may issue process for the arrest of persons so indicted, and commit, or hold such persons to bail; but said indictments shall be removed into the Court of Oyer and Terminer for trial, or other proceedings, thereupon." Id. ch. 94 § 1.

By the record of said Court of Oyer and Terminer and of this cause, it appears that the precept of the Judges of said Court for holding the Court of Oyer and Terminer by which said defendants were tried, and in which the verdict against them was rendered, did not direct any Grand Jury to be summoned; that the said indictment against them was found in the said Court of General Sessions of the Peace and Jail delivery, and was never removed therefrom into the Court of Oyer and Terminer for trial or other proceedings thereon.

The provisions of the Statutes of this State, relating to the summoning of a Grand Jury for the Court of Oyer and Terminer substantially follow the common law practice. Chitty, Crim. Law. *310; 2 Hale P. C. 153, 154.

The Statutes of the State of Delaware relating to this motion

establish the following propositions. There must either be an indictment found in the Court of General Sessions of the Peace and Jail Delivery, afterwards removed by *certiorari* to the Court of Oyer and Terminer, or an indictment found by a Grand Jury directed to be summoned in the precept for the Court of Oyer and Terminer.

No Grand Jury can be lawfully summoned for the Court of Oyer and Terminer by the Sheriff, except pursuant to a direction contained in the precept of the Court for the said Court of Oyer and Terminer.

If the Sheriff should summon a Grand Jury to the Court of Oyer and Terminer, without a proper precept, to that end issued by the Court and contained in the precept for the Court of Oyer and Terminer, his action in so doing is a nullity.

The following authorities bear out the contentions set forth above:   Bishop, Crim. Prac. §§ 888, 889 ; Thompson & Merriam, Juries § 551 ; *Finley vs. State*, 61 Ala. 201 ; *Jackson vs. Com.*, 13 Grat. 795 ; *State vs. Hardin*, 2 Rich. L. 533 ; *State vs. Symonds*, 36 Me. 128.

*R. C. White*, Attorney-General, contended that the objection taken was to a mere irregularity of which advantage must have been taken by plea in abatement.   By pleading over and going to trial it was waived and by verdict it was cured.     *United States vs. Gale*, 109 U. S. 55 ; *State vs. Carver*, 49 Me. 588 ; *Robinson's Case*, 2 Park. Cr. Rep. 235 ; *State vs. Stewart*, 7 W. Va. 731 ; *Seaborn's Case*, 4 Dev. 305.

GRUBB, J.   At the present session of this Court of Oyer and Terminer, Daniel Brown and John J. Swan were indicted by a Grand Jury of this Court of murder of the second degree and, after trial here by a petit jury of this Court, were found guilty of manslaughter.   Thereupon they moved for a new trial upon the ground, *inter alia*, that this verdict was unwarranted by the law and the evidence.   This Court being equally divided on this motion it

failed and the new trial was refused.   Whereupon the present motion for arrest of judgment was made upon the following grounds :

" 1.  That it appears by the record of the Court of Oyer and Terminer and of said cause that the Court of Oyer and Terminer had no jurisdiction to try said cause.

2.  That it appears by the record of said Court and said cause, that the Court of Oyer and Terminer had no jurisdiction to try the defendants in said cause, under the indictments therein, and had no jurisdiction to render judgment therein.

3.  That it appears by the record of this Court and said cause, that the indictment in said cause was found by the Grand Jury in the Court of General Sessions of the  Peace and Jail Delivery for said State, and was never removed, by *certiorari*, or other process, into said Court of Oyer and  Terminer, and that, therefore, under the statutes of  said State, the proceedings before said Court in  said cause were all *coram non judice*, and that  the said Court hath no jurisdiction to pronounce judgment in said cause."

It is unnecessary to consider or pass upon the third ground above stated.   I have personally examined the record of this Court and find  that it appears thereby that said  indictment was found by the Grand Jury, sitting as the Grand Jury in and for this Court of Oyer and Terminer.   This is also corroborated by  the statements made to me by the clerk of this Court, and to us, in open Court, by the Attorney General.

In this State, jurisdiction of all capital offences, and of murder of the second degree and manslaughter, is vested by the laws of the State, pursuant to the Constitution, in the  Court of Oyer and Ter-miner  composed of  the  Chief  Justice  and  the  three  Associate Judges of the State.   Its decision is final, and not subject to  writ of error or to appeal.   It has no regular terms fixed  by  law, but sits whenever the Judges of said Court shall issue a precept for holding a Court of Oyer and Terminer.

They  may  include in the precept a direction to the Sheriff to summon a Grand Jury for any such Court, or they may omit it

when the said Judges shall deem the summoning of such Grand Jury unnecessary. It is not absolutely obligatory upon the Judges to include in said precept any direction for summoning of a Grand Jury for a Court of Oyer and Terminer in any case: If they do not deem this necessary, the Grand Jury in attendance upon the next regular term of the Court of General Sessions, which is composed of the Chief Justice and the two of the Judges who do not reside in the county wherein it is sitting, may find the indictment for any of said offences, which may thereupon be removed to the Court of Oyer and Terminer for trial.

Statutory provision is made that, in the spring of every year, Grand Jurors for a standing panel, to serve for the ensuing year, shall be selected from the county by the Levy Court, and drawn by the Prothonotary and Clerk of the Peace, who shall immediately deliver to the Sheriff of the county a correct list of the names thereof, etc. The statute also directs the Sheriff, upon receiving the said list, to summon in writing each of said persons, at least ten days before the next ensuing term of the Court of General Sessions for his county, to serve as the standing grand jurors for that year at the said Court. Similar statutory provision is also made for the selection, drawing and summoning of petit jurors to the Court of General Sessions, etc. Provision is also made that the Sheriff shall make return to the Court of the separate panels of the grand and petit jurors summoned by him.

The statute also provides that the standing panel of Grand Jurors for the year " shall be summond and returned to attend, as Grand Jurors, at any Court of Oyer and Terminer, when the precept for holding said Court directs a Grand Jury to be summoned."

The statute also provides that for any Court of Oyer and Terminer, special Petit Jurors shall, upon notice from the Sheriff to .the Prothonotary and Clerk of the Peace that such Court is ·to be held, be drawn, summoned and returned according to the provisions for the regular Petit Jurors.

So that whenever the Judges shall deem it necessary to summon a Grand Jury to attend upon a Court of Oyer and Terminer,

they may also include in their precept designating the time for. holding such Court and directing the Sheriff to summon the special jurors, the further direction to summon the standing panel of Grand Jurors to attend therein. Whilst there is no statute expressly directing this course, or prescribing any particular form of precept, yet such has long been the general practice of this Court in such instances. But there is no enactment, expressly or by necessary implication, prohibiting this Court from modifying or entirely dispensing with this practice in any particular case if deemed necessary. Nor is there any enactment expressly declaring illegal, and its indictments void, any such standing Grand Jury actually summond and returned by the Sheriff, and serving in this Court. Without any precept of the Judges of this Court such Grand Jury would, under the statutes referred to, be in attendance upon the Court of General Sessions wherein an indictment for an offense like the present could be found and certified into this Court wherein the same Judges who composed the said Court of General Sessions, under our judicial system, constitute a three-fourths majority.

As the general practice throughout the State has been to have this Court called to meet at the regular term of the Court of General Sessions, when a Court of Oyer and Terminer is necessary for the trial of any indictment, it is practically immaterial whether a Grand Jury for this Court is ordered or not. For if not so ordered the indictment will be just as promptly found in, and *certioraried* for trial here from the Court of General Sessions, and therefore the Constitutional right of the accused to have a speedy and public trial by an impartial jury will not, substantially be injuriously affected. Consequently it may not be of material importance whether or not the practice of including in the precept the direction to the Sheriff for summoning the standing Grand Jury to attend this Court, be modified or entirely dispensed with in any particular case, where their summoning, return and attendance are actually secured in a regular manner otherwise as in the present instance.

It is the statute and not the precept which makes the standing panel the Grand Jurors of this Court, when having been legally

selected and drawn, they are actually summoned and returned and serving here. The said practice therefore is merely a convenient and reasonably certain mode of notifying the Sheriff and having their attendance when needed. Presumably the object of the practice as well as of our statutes which recognize it, was to secure the attendance of the Grand Jury in this Court with promptness and certainty, when it was deemed necesary to have it here. But if by mistake or accident, it should be ommitted in any instance at the time of preparing the precept, it might save serious delay and detriment not only to the prisoner but to the public, if notice to the Sheriff could be given with the approval of the Court in some other way, whereby the timely summoning and attending of such Grand Jury could be surely and actually secured. Yet, if the contrary view is adopted, then, in such instances, the object of the practice instead of being effected would be defeated.

The general ground, as the argument disclosed, upon which the defense have based their motion in arrest of judgment in this case, is that this indictment was not found by a legal Grand Jury of this Court of Oyer and Terminer, because, as they allege, the Grand Jury which found it in this Court was not lawfully summoned by the Sheriff to attend as the Grand Jury of this Court, and therefore that this Court can not lawfully try, or render judgment against them on the indictment under which the Petit Jury have found them guilty of manslaughter.

They contend that said Grand Jury was illegally summoned by the Sheriff to attend this Court of Oyer and Terminer because, as they allege, no proper and lawful precept for summoning said Grand Jury was made and delivered to that officer.

It is not claimed that these grand jurors were not selected by the Levy Court, drawn by the Prothonotary and Clerk of the Peace, and otherwise qualified in all respects, as prescribed by law. Nor is it contended that they were not duly summoned by the Sheriff; nor shown that they did not actually appear in this Court pursuant to his summons and find said indictment. Neither is it denied that the Sheriff received a lawful precept, duly signed by all the Judges

of this Court, attested by the Clerk, and under the seal of this Court, appointing the time for holding of the present Court of Oyer and Terminer, and commanding him to summon thereto the requisite special Petit Jurors, nor that there was written upon the face of said precept, on the margin thereof, the words :—" Summon the Grand Jurors for the Court of Oyer and Terminer."

The sole objection made to the validity of this precept is that the said portion thereof respecting the summoning of said Grand Jurors was irregular and unauthorized. That the holding of this Court and the summoning of the petit jurors was lawful in all respects is undisputed. That this Court has jurisdiction under the Constitution and statutes of this State, of the offense charged, and also of the persons of the prisoners by virtue of their lawful arrest and commitment for trial here, is unquestionable. Hence the only objection to the validity of the indictment in this case is that the Grand Jury was illegally summoned because of the alleged irregularity and illegality of that portion of the precept respecting the direction to the Sheriff to summon said Grand Jurors.

Bnt for the purpose of disposing of the present motion in arrest of judgment, it is not necessary to consider and determine whether or not the precept was, in whole or part, illegal and invalid ; nor whether or not the Grand Jury was illegally summoned by the Sheriff. Nor is it material to inquire whether or not the alleged irregularity or invalidity of the precept, in any respect, is a matter appearing of record. Because it is now firmly settled by authoritative adjudications in both this country and England, that by pleading not guilty to an indictment and going to trial without making any objection to the qualification of Grand Jurors, or the mode of summoning or impaneling them, the objection is waived. And this doctrine of waiver applies as well to cases where such objection appears of record. All such objections, where no statute makes the proceedings utterly void should be taken in limine, either by challenge, by motion to quash, or by plea in abatement. It is the prevailing rule that it is too late after a verdict to object to the competency of the Grand Jurors by whom the indictment was

found, or to the mode of summoning or impanelling them. *Robinson's case,* 2 Park. Cr. Rep. 235, 308, 311 ; *State vs. Carver,* 49 Me. 588, 593–4; *23 Am. St. Rep.* 626–627; *State vs. Stewart,* 7 W. Va. 731 ; *U. S. vs. Gale,* 109 U. S. 55–74. *Robinson's case, supra,* is especially applicable to the motion before us. There no precept for summoning the grand jury had been issued by the District Attorney to the Sheriff as the law required, though the Sheriff summoned them in the usual way, as he did in this case. But the Supreme Court of New York nevertheless held, after argument by able counsel, that this omission did not affect the substantial rights of the prisoner, and that the objection could not be raised after trial and conviction. Many authorities were referred to in the opinion of the Court, and this general statement was then made : " It seems to be well settled in most of the States that an objection to the qualification of grand jurors, or to the mode of summoning or impanelling them, must be made by a motion to quash or by a plea in abatement before pleading in bar." This announcement of the law in *Robinson's case* was afterwards quoted with marked approval by Mr. Justice Bradley, speaking for the Supreme Court of the United States, in *United States vs. Gale,* 109 U. S. 65–74, decided in 1883. It was equally relied on and approved in the leading case of *State vs. Carver,* 49 Me. 594, and has since been generally followed in this country. In the case last cited, after a verdict of guilty, there was a motion in arrest of judgment on the ground that it appeared by the *venires* that at least one of the persons acting on the grand jury which found the indictment was not legally drawn as a grand juror, on account of defects in the manner of notifying the town meetings for the draft of said jurors, etc., and therefore it was not a legal grand jury and consequently had no authority to find the indictment in question.

It was contended that, as the objection appeared of record by the return upon one of the *venires,* the motion in arrest of judgment should be sustained. The motion being overruled by the trial Court, the Supreme Court, on exceptions taken, sustained the decision below. It held, first, that this was not such an objection

appearing of record as could be sustained on a motion in arrest of judgment, and, secondly, that, by pleading generally to the indictment, the defendant admits its genuineness, and waives all matters that should have been pleaded in abatement. The Court say, " the decisions to this point, both in England and in this country, are numerous. But it is urged that such cases are to be distinguished from the one at bar, because here the defendents deny that there is any indictment, on the ground that there was no legal grand jury. The question here presented has often been raised in this country, and it has uniformly been held that it is too late, after a verdict, to object to the competency of the grand jurors by whom the indictment was found; or to the mode of summoning or impanelling them. All such objections must be pleaded in abatement. The Attorney General has cited other cases where the same doctrine is held. And we are not aware of any cases where it has been called in question."

In *State vs. Stewart*, 7 W. Va. 731, a statute provided that before any prisoner is tried for felony in a Superior Court he shall be examined before an inferior Court unless such examination be waived by his consent entered of record in such Superior Court. In this case the defendant did not make any motion to quash the indictment or do any other act before trial or verdict by which the attention of the Court would be directed to the fact as to whether he had been examined by the county Court touching said charge. But even in such a case, where the statute itself made such examination a prerequisite to the jurisdiction of the Superior Court to try the prisoner, it was nevertheless declared by the Supreme Court of Appeals, in that State, that if a defendant indicted for felony desired to claim the benefit of the provisions of said act, he should do so certainly before verdict of guilty, and, perhaps, before the jury to try the cause are selected, impanelled and sworn. In the same case this Court cited with approval the case of *Angel vs. Commonwealth*, 2 Va. Cases 231, wherein the Court said, "after verdict against the prisoner, he cannot move in arrest of judgment that he

was not examined (under the act) for the felony of which he was indicted. The objection comes too late."

In *United States vs. Gale*, 109 U. S. 65-74, above cited, Mr. Justice Bradley in a most able and elaborate review of the authorities, English and American, conclusively establishes the correctness of the doctrine announced in *Robinson's case*, as above stated. In this case, the Supreme Court of the United States was required to determine for the judges of the Circuit Court of the United States for the Northern District of Florida, whether or not a certain motion in arrest of judgment before them could be sustained. The ground urged in arrest of the judgment was that four persons, otherwise competent, were excluded from the panel of jurors who found the indictment, under a provision of the United States Revised Statutes, which the defendant alleged to be unconstitutional. The exclusion of these persons for this cause appeared by an amendment of the record, made *nunc pro tunc*, showing what took place; but no objection was taken to the indictment or proceedings on that account until after a plea of not guilty, and a conviction, when the objection was first taken on motion in arrest of judgment.

In this case the Court, by Mr. Justice Bradley, says: "The question as to the constitutionality of the 820th section of the Revised Statutes, which disqualifies a person as a juror if he voluntarily took any part in the rebellion, is not an essential one in the case inasmuch as by pleading not guilty to the indictment and going to trial without making objection to the mode of selecting the grand jury, such objection was waived. The defendants should either have moved to quash the indictment or have pleaded in abatement, if they had no opportunity, or did not see fit, to challenge the array. This, we think, is the true doctrine, in cases where the objection does not go to the subversion of *all* the proceedings taken in impaneling and swearing the grand jury; but relates only to the qualification and disqualification of certain persons sworn upon the jury or excluded therefrom; or to mere irregularities in constituting

the panel.   We have no inexorable statute making the whole proceedings void for any such irregularity."

Again the same Court say: "All ordinary objections based upon the disqualification of particular persons, or upon informalities in summoning or impaneling the jury, when no statute makes the proceeding utterly void, should be taken *in limine*, either by challenge, by motion to quash, or by plea in abatement. Neglecting to do this, the defendant should be deemed to have waived the irregularity. It would be trifling with justice, and would render criminal proceedings a farce, if such objections could be taken after verdict, even though the irregularity should appear in the record of the proceedings." And further the Court, through Mr. Justice Bradley, declare: " We think that the doctrine of waiver applies as well to cases where the objection appears of record as where it appears by averments ; and that it applies to all cases of objection to the qualifications of jurors, and to the mode of impaneling the jury ; but does not apply to cases where the proceeding is wholly void by reason of some fundamental defect or vice therein. In *Seaborn's case,* 4 Dev. 305, it was held that after conviction of murder, it was too late to take advantage of an error in constituting the grand jury, though it appeared in the record.

It will thus be seen that the Supreme Court of the United States has approved and relied upon *Robinson's case,* which held that the entire absence of the precept, although required by law, for summoning a grand jury, was an omission which did not affect the substantial rights of the prisoner, and which belonged to the class of objections that could not be raised after trial and conviction. As that case is substantially identical with that now before us, this convincing array of authority unquestionably warrants this Court in holding that the defendants have waived their objection to the grand jury and the indictment now in question. Therefore their motion in arrest of the judgment must be overruled.

MARVEL, J., concurred.

LORE, C. J. In this case a motion was made in arrest of judgment, upon the ground that the indictment was not found before a grand jury summoned to the Court of Oyer and Terminer, and, not being so found, was not certified up into the Court of Oyer and Terminer.

By the statute in that behalf, a Court of Oyer and Terminer in this State only exists by virtue of the precept, which is the writ of command from the Judges to the Sheriff. There are no regular terms of the Court of Oyer and Terminer, and no term of the said Court can be held without such precept as has been duly issued by order of the Judges of the Court. A precept in this case was duly issued. It contained, however, only the direction to make proclamation of the convening of the Court, and a direction to summon the petit jurors. There was in the body of the precept no order whatever to summon a grand jury for the Court of Oyer and Terminer. There is, however, an endorsement in red ink, upon the margin of the precept, in these words: " Summon grand jury for Court of Oyer and Terminer." This, however, is not in the body of the precept, and it is within the knowledge of this Court that it was not made by order of the Judges, but was a memorandum made by the clerk, of an order given by myself to him verbally, to see that the grand jury was summoned, and so direct the Sheriff.

As the sessions of the Court exist only by virtue of the precept, and grand and petit jurors can only be summoned by authority of its express terms, it is manifest that there was no order of the Judges for summoning the grand jury, and that there was no grand jury summoned for the Court of Oyer and Terminer. This goes to the existence of such a grand jury, and is not a matter of irregularity.

The indictment, therefore, being found by a grand jury which was duly summoned to the Court of General Sessions, and not having been certioraried up into the Court of Oyer and Terminer, the indictment was never legally before the last named Court. It follows, therefore, that the trial of the case in the Court of Oyer and

Terminer was *coram non judice,* and in the opinion of Judge Cullen and myself, the trial was without warrant of law.

I desire, however, expressly to put on record, that no fault whatever attaches to the Attorney General or to his Deputy, Mr. Cooper, in this matter. The latter expressly called the attention of the Court to the usual custom of certioraring indictments into the Court of Oyer and Terminer, and he was informed by the Court that it was not necessary, as we then supposed the grand jury had been duly summoned to the Court of Oyer and Terminer. No fault whatever attaches to the Sheriff. He faithfully complied with the verbal orders given him. No fault attaches to any one of my three associates who sit with me. The fault is absolutely and exclusively my own, and I am unwilling that any responsibility in the matter shall rest elsewhere.

To constitute a legal grand jury in the Court of Oyer and Terminer, the order for its summons must be in the body of the precept. In fact, only a verbal order was given, not by the Judges, but by myself only, which was a nullity. Such order gave no authority to the Sheriff, and I had no authority to give it ; but it grew out of the desire to save the trouble of certioraring indictments into the Court when we had authority to Constitute a Court of Oyer and Terminer in which indictments could be found in the first instance.

The grounds urged in arrest of judgment go to the existence of the grand jury, and not to regularity or irregularity in summoning.

It is idle, therefore, to speak of the irregular execution of a power, which power was never evoked and never existed.

We think the motion in arrest of judgment ought to prevail.

CULLEN, J. I regret very much that there should be a diversity of sentiment among the members of this Court upon the question that is presented for our consideration. But to my mind the facts are beyond all cavil and all doubt.

The Court of Oyer and Terminer is a Court that is organized

under the provisions of the Constitution for an express purpose; that is, the trial of capital offenses. Its functions are entirely confined to that, and it is regulated entirely by statute. It is not a Court having terms like the other Courts. It is subject, under the provisions of the statute, to be called by what is termed a " precept," which has always been the practice.

Much has been said here with regard to what has been the practice in this matter. In fact, there never has been but one practice, and that practice always will be just as it has been. Until a few years ago, all these forms were written out; they were not printed. I have never known of an indictment in a capital case that was not found in the Court of General Sessions, excepting one at the last term here, or the term preceding the last. Heretofore, the form of these precepts was drawn up by the Judges of the Court of Oyer and Terminer, who would put in some provisions with regard to the summoning of jurors. The Court of Oyer and Terminer, acting as such Court in the trial of cases, may, of course, act as a distinct Court and have its own grand jury. It may act in particular cases on indictments which are found without its having such grand jury. That is left entirely in the discretion of the Court, according to the necessities of the case. That is to say, if the indictment is to be found in the Court of Oyer and Terminer, there must be a grand jury summoned for that Court. If there is not such a grand jury, then it is a nullity; and you are trying a man just the same as if three justices of the peace should summon a grand jury and send in an indictment here; for you must have something to rest upon. It is not a matter of form; it is a matter of substance.

A man has a right, not only to have a fair and impartial trial, but he has a right to a trial according to the law of the land. What is the law of the land? That a Court of Oyer and Terminer shall be called; that it shall try all cases that are found within the Court of Oyer and Terminer, summoned as provided by statute. This is all a question of statute law; without the statute it is utterly

null and void, and a man tried under those circumstances is tried without law, gospel or anything else.

With regard to the issuing of this precept; the precept went out, and it stands there as nothing else in the world but a general order to call the Court of Oyer and Terminer. That is all. This indictment was not found by a grand jury summoned to the Court of Oyer and Terminer. That cannot be disputed. There is no doubt about it. This indictment was found by the grand jury of the Court of General Sessions of the Peace and Jail Delivery. Those are facts that are proven here for our consideration.

That indictment has never been certioraried or sent up to this Court. It is contended here that the defendants did not plead in abatement, and thereby waived their right. Plead in abatement to what? To a nullity? Is a defendant bound to enter a plea in abatement in a proceeding which is null and void? All those cases that have been cited refer to cases where there is irregularity. In substance, they are to the effect that if a person waives his right, where there is an irregularity or an informality, he cannot afterwards, having pleaded, take advantage of it. But where the proceedings are null in their incipient stage, at the very bottom and foundation, then the party can take advantage of it either by plea in abatement or by motion in arrest of judgment. It is never too late.

I know the general idea is that these parties have had a fair and impartial trial. Still, we must be governed by law. Once depart from the right path, and where are we?

Here are parties that have been tried—admittedly tried without any law or authority, because you have no Court of Oyer and Terminer unless that Court is legally called and legally exists. If it is legally called and legally exists, and cases are found by such Court, well and good; but if they are found by another Court, then you must follow the provisions of the statute, and the case must be regularly carried up by *certiorari*. That has not been done in this case.

As to the legality of this precept, the endorsement thereon is

a nullity. Nothing is in a paper except it is the body thereof. The paper, therefore, which is the record itself (and that is what we are trying) discloses that here is an indictment found in the Court of General Sessions and tried in the Court of Oyer and Terminer without being removed thereto by *certiorari :* which this Court has no more authority to try than we would have to try these men under an indictment for larceny and convict them of manslaughter.

I think, therefore,—although I am very sorry to disagree with my brother judges,—that the motion in arrest of judgment ought to be granted.

The court being equally divided the motion in arrest of judgment did not prevail.

*Ward* and *A. C. Gray,* for the prisoners Brown and Swan, thereupon raised the point that the jury having returned a verdict against the above named defendants, it was necessary for the Attorney General to make a motion that sentence be passed.

The Court unanimously overruled this point.

It was furthermore contended that the Court having been equally divided upon the question of jurisdiction, which had been raised in the motion in arrest of judgment, no judgment could be pronounced by the Court.

LORE, C. J. When a verdict is found, judgment passes as a matter of course unless arrest of judgment is ordered. The judgment will not be arrested without the interference of a majority of the court. As the motion has not prevailed, Judge Grubb will pronounce the sentence of the law upon the convicted prisoners.

GRUBB, J. Daniel Brown and John J. Swan, stand up.— Have either of you anything to say why the sentence of the law should not now be pronounced upon you ? You say nothing.

Sentence.

It has become a general usage for the judge imposing the sentence to make suitable preliminary remarks to the convicted prisoner in even ordinary criminal cases in this State. To pursue this course is peculiarly appropriate and important in the present instance, in view of the public and wide-spread interest felt in this very notable case, in consideration of the novel questions and uncommon incidents attending this hardly-contested and protracted trial, and in the hope that your conviction and punishment will have a beneficial influence upon those charged with the custody of those hapless and helpless inmates of insane hospitals here and elsewhere, who deserve kindly sympathy and gentle care instead of callous indifference and brutal cruelty.

The grand jury of this county, in attendance on this Court, having found an indictment charging you jointly with murder of the second degree, for the felonious killing of Leon Pisa, on October 5, 1895, in the Delaware State Hospital at Farnhurst, in this county, you were both tried and zealously defended by able and faithful counsel before an impartial jury at the bar of this Court, and found guilty of manslaughter.

On the morning of that day Leon Pisa was an inmate of said hospital. According to the evidence he was a well man sitting quietly on a seat beside one of the witnesses in this case, when you, Daniel Brown, directed him to go with you and receive the bath required by the hospital regulations. It is not shown that he was then actually demented, or a lunatic of violent or dangerous habits or disposition. He resisted by holding on by the seat until he was pulled from it and conducted along the corridor by you, Brown, and the witness, Oakes, to a point about five feet from the bath-room door, where you, John J. Swan, were then standing within sight of and immediate reach of him.

There Leon Pisa, an unarmed man, not shown to be a violent or dangerous patient, was surrounded by you, Brown, and Oakes, and within reach of you, Swan—all three of you vigorous, trained hospital attendants. It was not shown that he was greatly superior to any of you in either size or strength; nor that the three of you

could not reasonably and without force or violence fatal to his life have controlled him and defended your own lives and persons against any serious harm from him. Nor is it shown that, in the struggle which you both testified to, either of you received the slightest wound or injury to your persons. Yet, within a very few minutes after that struggle, Pisa was a dead man in your hands, with a completely fractured skull and two broken ribs.

Moreover, although it should have been manifest to Dr. Hammond, if he was a competent physician, that Pisa had not died from natural causes, he was nevertheless hastily buried without notice to the coroner and in violation of law.

In view of these undisputed facts, in connection with all the evidence in the case, the jury disbelieved your defence and found that you had feloniously caused the death of Pisa and were each guilty of manslaughter.

Thereupon, through your counsel, you moved for a new trial on several grounds, among them that the verdict was unwarranted by the law and the evidence, and also that the Court, being equally divided as to the competency of David M. Waples as a witness, erred in admitting him to testify before the jury, although he was admitted subject to the right of the jury to judge of the credibility and weight of his testimony viewed in connection with all the other evidence.

To obtain a new trial, the burden was upon you to satisfy a majority of this Court—in this instance three—of the sufficiency of the grounds urged in that behalf. This you failed to do; for the Court was equally divided on the subject—one-half of us believing that the verdict was in all respects just and legal. Accordingly, a new trial was refused.

The prevailing members of the bench, who denied your motion, were not only satisfied that Waples was not shown to be incompetent to testify, but were also convinced that, under the precedents and settled practice in this and other Courts of this State he was legally admitted by the division of the Court as to his admissibility. This principle was established in this very Court in the

case of *State vs. Brown*, 1 Houst. Cr. Cas. 545, by Chief Justice
Comegys and Judges Wootten, Houston and Wales, sitting in that
case, as necessary to the progress of a trial under our judicial sys-
tem.   That their decision is binding upon us as a precedent and
course of practice applicable to this case, until reversed at least
by a majority of this Court, which has not yet been done, is firmly
believed by our side of this Court, consisting of Judge Marvel and
myself. ·

Your application for a new trial having failed, thereupon your
counsel moved an arrest of judgment.   After argument and mature
consideration that motion failed to secure the support of the requis-
ite majority of this Court, and the motion, owing again to a divided
Court, has been overruled; and, judgment not being arrested, sen-
tence, as a matter of course, must now be passed upon you.

That a divided Court should produce this result is not new or
surprising in this State or elsewhere.   Very recently the Supreme
Court of the United States, the highest judicial tribunal in the
land, was equally divided on the question of the constitutionality
of the United States income tax law.   The result was that the
statute stood until subsequently a majority was obtained to secure
its total annulment.

Again, in 1819, in this State, in the case of *Clark vs. Kean*, 1
Del. Ch. 114, the High Court of Errors and Appeals, by an
equally divided Court, affirmed a decree of the Chancellor before it
on appeal; and thereupon all the Judges unanimously concurred in
framing and rendering the required form of judgment of affirm-
ance.   They did this as absolutely necessary under our judicial sys-
tem to prevent a deadlock and consequent miscarriage of justice in
any case before the Court.   During the three-quarters of a century
which have since elapsed, this rule has continued to be uniformly
observed in this State by our Court of Errors and Appeals, as well
as in this Court as shown by *State vs. Brown*, which I have just
cited.

As late as 1888 it was expressly considered and unanimously
recognized in the Court of Errors and Appeals in the case of

Sentence.

*Walker vs. Farmers Bank,* 8 Houston, 258, in which I myself sat with Chief Justice Comegys and Judges Houston and Paynter. So that it is impossible now to question its justice, or disregard its binding authority in this instance without utterly repudiating the wise and necessary doctrine of adhering to the precedents established in our highest and most authoritative judicial tribunal.

The verdict of the jury in this case, like the decree of the Chancellor in the cases I have just mentioned is presumed to be valid and legal in all respects until the contrary is found by a majority of the court in which it is called in question. Before verdict, the accused person is presumed to be innocent until the jury is satisfied beyond a reasonable doubt of his guilt. After verdict he is presumed to be guilty until the legal validity of the verdict is impeached to the satisfaction of a majority of the Court in one of the modes allowed and recognized by the law.

Here there are but two modes allowable for this purpose, namely, the respective motions for a new trial and in arrest of judgment. These having been resorted to by you in vain, and your right to move to challenge the grand or petit jury panels, to quash the indictment, and to plead in abatement before verdict, not having been exercised, you have either exhausted or waived the liberal provisions reasonably allowed by law for the protection of the accused. As the public have rights as well as the accused, the law can justly accord no further delays consistently with the public interest and welfare.

Nothing further can now be urged against the legal validity of the proceedings relating to your trial, or of the verdict against you. You are therefore, in legal contemplation, conclusively presumed to be guilty of manslaughter, and the law will not permit the contrary to be shown. This being so, it is the imperative mandate of the law and the absolute duty of the Court to pronounce the sentence of the law for the punishment of the offense found by the verdict. It is not the sentence of the court but of the law, for the court is but the appointed agent of the law to execute its mandate.

Our statute declares that every person who shall commit the

Sentence.

crime of manslaughter shall be deemed guilty of felony and shall be fined not less than $400.00 nor more than $4000.00, and shall be imprisoned for a term of not less than one nor more than five years. Hence it peremptorily forbids the court to impose upon the person lawfully convicted of manslaughter less than a $400.00 fine and one year's imprisonment or more than a $4000.00 fine and five years' imprisonment. Between this prescribed minimum and maximum the court is allowed a discretion but as to whether or not it will impose this minimum it has no discretion. This much must be imposed whether the court, as a whole or a divided bench, approve of it or not. *Ita lex scripta est.* A unanimous—much less a divided—court is powerless to repeal a statute; nor can it lawfully evade its mandate. To attempt this would be to violate the law which the court was created to enforce, and to disregard the duty which it has solemnly sworn faithfully to perform. If persisted in, the consequences of such a course would surely paralyze the administration of justice, subvert social order, and imperil the public safety and general welfare.

Wherefore, it is that the grave and imperative duty is now devolved upon this Court of imposing upon each of you the sentence of the law which you have been legally found guilty of violating.

The sentence of the law, as considered by the Court, is that you forfeit and pay to the State of Delaware a fine of $400.00 ; that you be imprisoned in the public jail of this county for the term of one year, commencing this day and ending the 17th day of March, A. D., 1897, and that you pay the costs of your prosecution ; and you are now committed to the custody of the Sheriff until this sentence is fully executed.